**UNITED STATES STEEL CORPORATION, Appellant,**

**v.**

**UNITED MINE WORKERS OF AMERICA, District No. 4, United Mine Workers of America, and United Mine Workers of America, Local Nos. 6321, 1980 and 6548, Appellees.**

No. 78–1395.

United States Court of Appeals, Third Circuit.

Argued Nov. 16, 1978.

Decided Feb. 9, 1979.

Phillip J. Sheehe, Billy M. Tennant, Pittsburgh, Pa., for appellant.

Harrison Combs, Washington, D. C., Paul M. Puskar, Lee A. Lazar, Kuhn, Engle & Stein, Pittsburgh, Pa., for appellees.

Before ALDISERT and HUNTER, Circuit Judges, and GERRY,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

United States Steel Corp. (U.S. Steel or Company) brought this action under section 301 of the Labor Management Relations Act for an injunction and damages against the United Mine Workers of America (International); District 4, United Mine Workers of America (District); and Union Locals Nos. 6321, 1980, and 6548, United Mine Workers of America. First, U.S. Steel claimed that it was entitled to an injunction and damages against the three Locals because their members engaged in work stoppages in violation of a collective bargaining agreement. Second, U.S. Steel claimed that it was entitled to damages against the International and District for their failure to exercise all reasonable efforts to prevent the illegal work stoppages. Relying on *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), and *United States Steel Corp. v. United Mine Workers*, 548 F.2d 67 (3d Cir. 1976), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977), the district court granted the defendants' motion for summary judgment against U.S. Steel. We reverse.

### I.

This action had its origin in a dispute between U.S. Steel and United Mine Workers Local 1816 at U.S. Steel's Mt. Braddock Mine in Fayette County, Pennsylvania. The members of Local 1816 contested management's filling of a vacancy for a continuous mine operator at the Mt. Braddock mine with a fully trained employee rather than an employee with less training but more seniority. On Friday, March 26, 1976 the members of Local 1816 struck the Mt. Braddock mine. The following Monday, March 29, pickets from Local 1816 appeared at three other mining and mining-related operations owned by U.S. Steel. Employee-members of UMW Local 6321 at the Robena No. 1 Mine and Robena Preparation Plant, employee-members of UMW Local 1980 at the Dilworth Mine, and employee-members of UMW Local 6548 at the Filbert Shop all

---

* Honorable John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation.

refused to cross the picket lines. Operations ceased at all three U.S. Steel locations.

U.S. Steel immediately[1] brought two companion actions under section 301 of the Labor Management Relations Act.[2] In one action it sued Local 1816, the District, and the International for a preliminary injunction to compel the employees to return to work. In a separate action, the one now here on appeal, it sued Locals 6321, 1980, and 6548, the District, and the International seeking both an injunction and damages. The Company contended that the defendants breached the collective bargaining agreement by refusing to cross the picket lines set up by members of their sister local. A hearing on U.S. Steel's requests for preliminary injunctions in both actions was held at 4:45 p.m. on March 30, 1976. The district court granted the preliminary injunction against Local 1816 on that date, but denied the request for a preliminary injunction in this action on the attorneys' representation that the employees had returned to work. In fact, by 4:00 p. m. on March 30, operations had resumed at all three locations—the Robena No. 1 Mine and Robena Preparation Plant, the Dilworth Mine, and the Filbert Shop. On March 31, 1976 work resumed at the Mt. Braddock Mine, the site of the original or underlying dispute.

U.S. Steel continued to press its damages action against Locals 6321, 1980, and 6548, the District, and the International.[3] Defendants brought a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure alleging that U.S. Steel failed to state a claim upon which relief could be granted. Treating the defendants' motion to dismiss as a motion for summary judgment, the district court awarded summary judgment

to the defendants on January 30, 1978. Local 1816 is not a party to this action, nor is U.S. Steel's separate action against Local 1816 before us.

## II.

We are presented first with the issue of whether a union local is liable for damages for breach of an implied no-strike obligation if the local refuses to cross the picket lines of a sister local, when the sister local is protesting over an arbitrable dispute with a *common* employer. In *United States Steel Corp. v. United Mine Workers*, 548 F.2d 67 (3d Cir. 1976), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977) (*U.S. Steel II*), this court held that the defendant local did not breach an implied no-strike obligation when the defendant local refused to cross the picket lines of its sister local, which was picketing over a dispute with a *different* employer. We must decide whether the reasoning of *U.S. Steel II* controls this case.

U.S. Steel's action sounds in contract. Specifically, U.S. Steel alleges that by refusing to cross the Local 1816 picket lines, the defendant locals here breached their obligations under the National Bituminous Coal Wage Agreement of 1974. While the 1974 Agreement between U.S. Steel and the UMW does not contain a no-strike clause, it does contain a broad binding, compulsory arbitration clause which provides:

*Section (c)* Grievance Procedure

Should differences arise between the Mine Workers and the Employer as to meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the

---

1. U.S. Steel filed its complaint in this action on March 29, 1976, the day the pickets first appeared at the three other mines.

2. Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976), provides in part:

 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . .

may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

3. U.S. Steel calculated that as a result of the work stoppage, it suffered damages totalling $37,741.00. The action for an injunction is now moot.

mine, an earnest effort shall be made to settle such differences at the earliest practicable time.

*Section (h)* Finality of Decision or Settlement

Settlements reached at any step of the grievance procedure shall be final and binding on both parties and shall not be subject to further proceedings under this Article except by mutual agreement.

1974 Agreement at Article XXIII. *See also* Article XXVII—Maintain Integrity of Contract and Resort to Courts ("it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts.")

 In the absence of an express no-strike clause, U.S. Steel must rest its breach of contract action on an implied obligation not to strike. The Supreme Court implied a no-strike obligation from a collective bargaining agreement in *Local 174, Teamsters Union v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). There, the employer sued the striking union for damages for breach of contract under section 301 of the Labor Management Relations Act. The collective bargaining agreement did not contain an express no-strike clause. The Court noted, however, that the dispute arose over an issue that was within the contract's mandatory arbitration clause. To protect what it considered to be the basic policy of labor legislation—the promotion of the arbitral process as a substitute for economic warfare, *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)— the Court held that "a strike to settle a dispute which a collective bargaining agreement provides shall be settled exclusively and finally by compulsory arbitration constitutes a violation of the agreement." 369

U.S. at 105, 82 S.Ct. at 577. Thus, courts have jurisdiction under section 301 to redress a violation of a labor contract when a union strikes over issues which it has agreed to submit to binding, terminal arbitration. However, the Court emphasized that the implied no-strike obligation extends only over issues within the compulsory arbitration clause.

The jurisdiction of federal courts over suits alleging a breach of an implied no-strike obligation has been explored in the context of the continuing effort to resolve the apparent conflict between section 4 of the Norris-LaGuardia Act [4] and section 301 of the Labor Management Relations Act. Section 4 of the Norris-LaGuardia Act provides that no federal court shall have jurisdiction to issue restraining orders or injunctions which would prevent parties to a labor dispute from engaging in a strike. However, in *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court pointed out that "[t]he Norris-LaGuardia Act was responsive to a situation totally different from that which exists today." *Id.* at 250, 90 S.Ct. at 1592. In accommodating the two Acts, the Court believed that the policy of the Norris-LaGuardia Act—to foster the growth and viability of labor organizations—would be advanced if section 301 of the Labor Management Relations Act were construed to allow the courts to enforce the freely bargained obligation of the union to submit disputes to arbitration. *See also Teamsters Local Union No. 30 v. Helms Express, Inc.*, 591 F.2d 211 at 218 (3d Cir. 1979).

Accommodation of the two Acts continued in *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). The union contended that the federal court lacked jurisdiction to enjoin a pending strike because of section 4

---

**4.** Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104 (1976), provides in part:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons

participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment; . . . .

of the Norris-LaGuardia Act. In rejecting the union's claim, the Court extended *Boys Markets* : "Although the collective-bargaining agreement in *Boys Markets* contained an express no-strike clause, injunctive relief may also be granted on the basis of an implied undertaking not to strike," *id.* at 381, 94 S.Ct. at 638 (footnote omitted), citing *Local 174, Teamsters Union v. Lucas Flour Co.*, 369 U.S. 95 (1962).

 Thus, *Boys Markets* and *Gateway Coal* demonstrate that even the explicit language of the Norris-LaGuardia Act must give way to a suit under section 301 to protect the obligation of the parties to arbitrate. Judicial power, however, is confined to enforcing the contractual obligation not to strike over disputes which both parties have agreed to submit to arbitration.

Defendants rely heavily on *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). There, United Steelworkers had been certified to represent Buffalo Forge's office-clerical-technical (O&T) employees. Unable to negotiate an acceptable contract, the O&T employees went on strike. Buffalo Forge's production and maintenance (P&M) employees refused to cross picket lines set up by the O&T employees. The collective bargaining agreement between the United Steelworkers and Buffalo Forge covering the P&M employees contained a no-strike clause, but did not expressly forbid sympathy strikes; of course, at the time of the dispute, no contract existed between Buffalo Forge and the O&T employees. The employer sought an injunction against the strike by the P&M employees, pending arbitration over whether that strike violated the no-strike clause. The Supreme Court held that the district court did not have the power under section 301 of the Labor Management Relations Act to enjoin the strike by the P&M employees:

> The strike at issue was a sympathy strike in support of sister unions negotiating with the employer; *neither its causes nor the issue underlying it was subject to the settlement procedures provided by the contracts between the employer and re-*

*spondents.* The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain. *Id.* at 407–08, 96 S.Ct. at 3148. Further, the Court stated that a mandatory arbitration clause alone does not give rise to an implied obligation not to engage in sympathy strikes. *Id.* at 408–09 n. 10, 96 S.Ct. 3141. *Buffalo Forge*, then, established that in the classic sympathy strike situation, where the underlying strike is not in breach of a collective bargaining agreement, the secondary strikers will not be held liable for breach of an implied no-strike obligation. Thus, the Court held that the case did not come within the narrow exception to the Norris-LaGuardia Act established in *Boys Markets* which allowed enforcement of the contractual promise to arbitrate.

This circuit discussed the principles of *Buffalo Forge* in *United States Steel Corp. v. United Mine Workers*, 548 F.2d 67 (3d Cir. 1976), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977) (*U.S. Steel II*). There, West Virginia coal miners who were members of UMW Local 1058 struck over a dispute with their employer, the Christopher Coal Company. When they picketed at U.S. Steel's Robena mine in Pennsylvania, the employee-members of Local 6321 refused to cross the picket line, closing the mine. U.S. Steel sued Local 6321, the District, and the International for damages under section 301 of the Labor Management Relations Act. In the absence of an express no-strike clause in the bargaining agreement, the allegation was that the union had breached a no-strike obligation which was implied from a mandatory arbitration provision. Thus, the underlying dispute was between the Christopher Coal Company and Local 1058, while the damages action was between U.S. Steel and Local 6321.

Preliminarily, *U.S. Steel II* rejected attempts to distinguish *Buffalo Forge*. The employer had argued that *Buffalo Forge's* holding rested ultimately on the terms of the Norris-LaGuardia Act. Because *U.S. Steel II* was an action for money damages,

206

the employer had contended that Norris-LaGuardia, and therefore *Buffalo Forge*, had no application. However, this court noted that both the propriety of an injunction enjoining the work stoppage pending arbitration and the propriety of an award of monetary damages depend on whether the union is under a contractual duty not to strike. In both situations, we noted, in the absence of a non-strike clause, the scope of the implied no-strike agreement is hinged to the scope of the mandatory arbitration clause. Thus, "[w]hat *Buffalo Forge* establishes regarding the arbitrability of sympathy strikes is as applicable to this particular suit for monetary damages as it is to a request for injunctive relief." 548 F.2d at 72.[5]

We recognized in *U.S. Steel II* that the employer's action required a showing that Local 6321 had breached an implied no-strike obligation. However, we pointed out that there was no dispute between U.S. Steel and the defendant Local which was subject to arbitration. Rather, the members of Local 6321 struck in response to picket lines erected by members of Local 1058, who were protesting over a dispute with their employer, the Christopher Coal Co. This court did not feel compelled to decide whether the underlying dispute was subject to compulsory arbitration. Regardless of whether the underlying strike was legal or illegal, "[t]he job-bidding dispute at the Humphrey mine [the underlying dispute] which precipitated the Robena work stoppage was a dispute between the Christopher Coal Company and members of UMW Local 1058; that dispute could not possibly have been arbitrated by the United States Steel Corporation and UMW Local

6321." *Id.* at 73 (footnote omitted). Since the dispute was not within the mandatory arbitration provision in the contract running between U.S. Steel and the UMW, the strike was not in breach of that contract.

The defendants here urge us to extend this analysis one step further. They are confronted with the fact that although in *U.S. Steel II* there were two employers, in this case a single employer was involved in both the underlying dispute and the secondary strike. The defendants point out, however, that the National Bituminous Coal Wage Agreement of 1974 provides for mine by mine grievance resolution. *See* Article XXIII—Settlement of Disputes. If a mine worker has a grievance against the employer, he first complains to his foreman. If the employee and the foreman do not reach agreement, then the complaint is referred for joint resolution by the mine committee and mine management. Only if the mine committee and mine management fail to reach agreement is the matter taken up at the District level and higher. The Union stresses that even though this case involves a common employer, the underlying dispute and the secondary action arose between that employer and separate locals. Therefore, analogizing to *U.S. Steel II*, the Union contends that U.S. Steel and Locals 6321, 1980, and 6548 cannot arbitrate a dispute between U.S. Steel and Local 1816.

The Fourth Circuit rejected this position in *Cedar Coal Co. v. United Mine Workers*, 560 F.2d 1153 (4th Cir. 1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978). There, the members of UMW Local 1759 struck a mine owned by the Cedar Coal Co. Those employee-members picket-

**5.** The policy reasons behind the accommodation of section 301 of the Labor Management Relations Act and section 4 of the Norris-LaGuardia Act exist even when the relief sought is damages after the strike has terminated. Thus, in *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), the Court noted: *"Lucas Flour* involved a damages action for breach of the implied no-strike obligation, while the present case involves injunctive relief. The policy reasons favoring the availability of injunctive relief, however, are equally compelling." *Id.* at 381 n. 14,

94 S.Ct. at 639. *Boys Markets v. Retail Clerks Union Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), also explained:

[A]n award of damages after a dispute has been settled is no substitute for an immediate halt to an illegal strike. Furthermore, an action for damages prosecuted during or after a labor dispute would only tend to aggravate industrial strife and delay an early resolution of the difficulties between employer and union.

*Id.* at 248, 90 S.Ct. at 1591.

ed at several other mines, including another mine owned by the Cedar Coal Co. The Cedar Coal employees at the second location, members of Local 1766, refused to cross the picket lines. Relying on *Buffalo Forge*, the district court dismissed Cedar Coal's complaint.

The Fourth Circuit conceded that the dispute "may not technically have been over a grievance which both parties are contractually bound to arbitrate" because the court considered that Cedar Coal was contractually bound to arbitrate the dispute with Local 1759, not Local 1766. However, the court held:

> [S]ince the purpose of the strike of Local 1766 was to compel Cedar to concede an arbitrable issue to Local 1759, with the same employer, the same collective bargaining agreement, the same bargaining unit, and the cause of Local 1759 made its own, the *Buffalo Forge* exception to *Boys Markets* should not apply.

Id. at 1172.[6] The most important factor to the Fourth Circuit was that the underlying strike was illegal; that is, the underlying strike was over an issue that was within the mandatory arbitration provision of the collective bargaining agreement running between Cedar Coal Co. and the UMW. The

court read *Buffalo Forge* as tying together the "non-arbitrability of the underlying cause with the cause of the strike at issue so that, when the underlying cause is not subject to arbitration, a refusal to cross a picket line, generated by a strike over the underlying cause, is not a violation of a no-strike clause." 560 F.2d at 1169.

This court discussed the reach of *Buffalo Forge* in *Republic Steel Corp. v. United Mine Workers*, 570 F.2d 467 (3d Cir. 1978). There, the members of UMW Local 6290 struck their employer, the Buckeye Coal Company, and picketed at two mines owned by the Republic Steel Corp.; the members of UMW Locals 9873 and 688, who were also employees of Republic Steel, refused to cross the picket lines. The record did not disclose whether the underlying dispute, between Buckeye Coal Company and Local 6290, was subject to the compulsory arbitration. Republic Steel sued the Locals, the District, and the International for damages under section 301. In sketching what proof would be required to hold the International liable, we considered that "Republic should . . . be required to prove that the dispute [the UMW Local 6290] pickets had with *their* employer or employers was one

---

**6.** The Sixth and Seventh.Circuits have recently rejected the "cause made its own" rationale for imposing liability on sympathy striking locals. In *Zeigler Coal Co. v. Local 1870, United Mine Workers*, 566 F.2d 582 (7th Cir. 1977), *cert. denied*, 436 U.S. 912, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978), the court held:

> There is nothing in the record before us, however, supportive of the company's contention that, by refusing to cross the stranger pickets, the defendants [sympathy strikers] were adopting the grievances and goals of the West Virginia local as their own and thus striking "over" a matter subject to arbitration. Like the Sixth Circuit in *Southern Ohio Coal Co. v. United Mine Workers of America*, 551 F.2d 695, 703–05 (6th Cir. 1977), we are unpersuaded that the mere fact that the defendants were bound by the same contract as their brother West Virginia miners means that they had any direct or beneficial interest in the outcome of the underlying dispute that precipitated the West Virginia strike.

566 F.2d at 585. Significantly, neither *Zeigler Coal* nor *Southern Ohio Coal Co. v. United Mine Workers*, 551 F.2d 695 (6th Cir.), *cert. denied*, 434 U.S. 876, 98 S.Ct. 227, 54 L.Ed.2d

155 (1977), concerned a single employer involved in both the underlying dispute and the secondary action.

Moreover, it is apparent that the Fourth Circuit did not intend its "cause made its own" rationale to apply to cases where the employer in the underlying dispute is different from that in the secondary strike. The Fourth Circuit's opinion in *Cedar Coal* was a consolidation of several appeals. One of the appeals involved a suit by Southern Coal Co. against UMW Local 1949 when the employee-members of that Local refused to cross picket lines set up by members of Local 1759. Again, the underlying dispute was between Cedar Coal Co. and Local 1759. The Fourth Circuit followed the same approach that this court did in *U.S. Steel II*:

> Even considering that the underlying purpose of 1949's strike may have been to put indirect pressure on Cedar to concede an arbitrable issue to Local 1759, Southern could concede nothing to Local 1759 because it was not bound to it by a collective bargaining agreement, and there was no dispute between Southern and Local 1759.

560 F.2d at 1172 (footnote omitted).

that was subject to the grievance and arbitration clause contained in the [1974] Agreement." *Id.* at 478. However, in the context of *Republic Steel*, involving different employers, this court refused to reverse the district court's award of summary judgment to the District and Locals. *See U.S. Steel II*, 548 F.2d 67. We continued: "This is not to suggest, however, that a different result might not be forthcoming upon proper allegations and proof that the districts, sub-districts, and locals had discrete obligations under the collective bargaining agreement, custom, and/or the provisions of the constitutions and by-laws of the several unions." 570 F.2d at 478. Thus, this court also regarded the key to *Buffalo Forge's* holding, (that a federal court did not have jurisdiction under section 301 to enjoin the secondary strike) to be that the underlying dispute there was not subject to arbitration.

█ Combining the requirements of *Buffalo Forge* and *U.S. Steel II*, we believe that two elements must be satisfied for the three Locals here to be liable under section 301 for breach of their implied no-strike obligation. First, under *Buffalo Forge*, the underlying dispute must be subject to compulsory arbitration between the parties to the dispute. Second, under *U.S. Steel II*, the parties at odds in the underlying dispute and the parties at odds in the action for breach of the implied no-strike agreement must be the same.

█ Both elements are present here. First, the district court found that the underlying dispute—the dispute between U.S. Steel and Local 1816—was subject to compulsory arbitration. The district court made the finding at the hearing held on March 30, 1976 to consider U.S. Steel's requests for preliminary injunctions in both the action against Local 1816 and the action against Locals 6321, 1980, and 6548. In granting the preliminary injunction against Local 1816, the district court found that the dispute between Local 1816 and U.S. Steel was within the compulsory arbitration clause. *See Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 2 L.Ed.2d 199 (1970). The three defendant Locals here, as well as the District and the International, were parties to that proceeding, and the finding of the district court is properly a part of the record of this case on appeal.

Second, we reject the defendants' argument that, because the underlying dispute involved Local 1816 and the damages action here involves Locals 6321, 1980, and 6548, the parties to the underlying dispute are not the same as those involved in this breach of contract action. We concede that U.S. Steel and Locals 6321, 1980, and 6548 cannot technically arbitrate the dispute between U.S. Steel and Local 1816. But we feel, as did the Fourth Circuit in *Cedar Coal*, that to preclude relief on that basis would be an overly narrow application of *Buffalo Forge*. The defendants here cannot escape the fact that the dispute is between " 'the Union and the employer'--between UMW and U.S. Steel." *U.S. Steel II*, 548 F.2d at 74, *quoting Buffalo Forge*, 428 U.S. at 405, 96 S.Ct. 3141. The National Bituminous Coal Wage Agreement of 1974 runs between each signatory employer and "the International Union, United Mine Workers of America . . . on behalf of each member thereof." In short, while each employer signed the 1974 Agreement, the International signed on behalf of all the union members. Individual locals are not parties to the contract. The dispute resolution system established by the 1974 Agreement that begins at the mine level is a convenient method of resolving employee grievances; however, it cannot erase the overall contractual relationship running between U.S. Steel and the United Mine Workers on behalf of its members. In fact, Article XXIII on Settlement of Disputes never mentions the UMW Locals. Rather, the Article speaks in terms of resolving disputes "between the Mine Workers and the Employer." Thus, the fact situation here fulfils the requirement of *U.S. Steel II* that the adverse parties in the section 301 action be the same as were involved in the underlying dispute.

Moreover, the policy behind *Buffalo Forge* supports our conclusion that the

three secondary striking locals here breached their contractual no-strike obligations. In refusing to call the secondary strike in *Buffalo Forge* a breach of the union's no-strike obligation, the Court found it important that "[t]he strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain." 428 U.S. at 408, 96 S.Ct. at 3148. Here, the refusal of the employee-members of Locals 6321, 1980, and 6548 to cross the Local 1816 picket lines must have had the effect, even assuming it was not the purpose, of exerting pressure on their common employer, U.S. Steel, to concede an arbitrable issue to the Union. *See Cedar Coal*, 560 F.2d at 1172.[7]

### III.

Finally, U.S. Steel contends that the district court erred in granting summary judgment in favor of the International and the District. The International and the District do not dispute that under the reasoning of this court in *Republic Steel Corp. v. United Mine Workers*, 570 F.2d 467 (3d Cir. 1978), they may be held liable for failure to "exercise all reasonable efforts to halt conduct of [their] members which is proven to be unlawful." *Id.* at 470. Moreover, their liability is not dependent on our holding in Part II. In *Republic Steel* itself, the employer suing the secondary strikers for breach of contract was not the same employer who was involved in the underlying dispute.

Instead, the International and the District contend that U.S. Steel has not properly alleged in its Complaint that the defendants failed to use all reasonable efforts to halt the unlawful conduct. However, the Federal Rules of Civil Procedure provide for notice pleading, *Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2

L.Ed.2d 80 (1957); *Rannels v. S. E. Nichols, Inc.*, No. 78–1637, 591 F.2d 242 (3d Cir. Jan. 18, 1979); furthermore, the defendants have not demonstrated that this case comes within one of the exceptions to the general notice pleading requirement where the rules require greater specificity. *See* Fed. R.Civ.P. 9.

Plaintiffs make several references in their Complaint to the failure of the defendants to take steps to halt the illegal work stoppage. In paragraph 17 of its Complaint, U.S. Steel alleges: "Because of the illegal work stoppage by Defendants and their members, Plaintiff has been deprived of the use and benefit of [several work locations]." In paragraph 19, the Complaint alleges: "As a result of the conduct of the Defendants, and their members employed by Plaintiff at its Dilworth Mine, Plaintiff has suffered irreparable harm and injury." Further, in the prayer for relief, U.S. Steel requests: "That Defendants' officers and representatives be directed to take all action which may be necessary to assure compliance with the terms of the [National Bituminous Coal Wage Agreement of 1974]." While it is true that demand for judgment is not a part of the claimant's cause of action, *Cohen v. Randall*, 137 F.2d 441, 443 (2d Cir.), *cert. denied*, 320 U.S. 796, 64 S.Ct. 263, 88 L.Ed. 480 (1943); *United States v. Metro Development Corp.*, 61 F.R.D. 83, 86 (N.D.Ga.1973), the prayer may be utilized "in pointing up the contentions of the parties." 6 Moore's Federal Practice ¶ 54.60, at 1216 (2d ed. 1976). *See Peitzman v. City of Illmo*, 141 F.2d 956, 962 (8th Cir.), *cert. denied*, 323 U.S. 718, 65 S.Ct. 47, 89 L.Ed. 577 (1944); *Rank v. Krug*, 90 F.Supp. 773, 784 (S.D.Cal. 1950).

---

**7.** Defendants contend that a crucial element in *Cedar Coal's* holding was that there was an allegation in the complaint that the purpose of Local 1766's refusal to cross Local 1759's picket lines was to force Cedar Coal Co. to concede an arbitrable issue to Local 1759. They would distinguish this case from *Cedar Coal* on the ground that no such allegation is present in U.S. Steel's complaint. However, *Buffalo Forge* indicates that the secondary action may

be illegal if either "the purpose [or] the effect" of the strike is to deprive an employer of its right to arbitrate disputes within the mandatory arbitration provision. Thus, an allegation of the illegal intent of the secondary strikes would seem to be unnecessary. Moreover, the intention of the three defendant Locals here is a question of fact on which summary judgment should not be granted unless there is no genuine dispute. Fed.R.Civ.P. 56.

Moreover, U.S. Steel pressed its action against the International and District before the district court. In Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, U.S. Steel argued that "[b]oth the International and the District are liable for the conduct of their Locals and for failure to take all reasonable steps to terminate the work stoppage and its spread." Furthermore, defendants have not claimed that they were surprised by the attempt to impose damages against them. Considering the allegations made in the body of the Complaint, as amplified by the prayer for relief, and plaintiff's Memorandum to the district court in support of its contentions, we hold that U.S. Steel made sufficient allegations against the International and the District to withstand a motion for summary judgment.

## IV.

Upon consideration of the Supreme Court's opinion in *Buffalo Forge v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), and this court's opinion in *United States Steel Corp. v. United Mine Workers*, 548 F.2d 67 (3d Cir. 1976), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977), we hold that the district court improperly granted summary judgment in favor of UMW Locals 6321, 1980, 6548. Also, we hold that U.S. Steel made sufficient allegations in its complaint to state a claim against the International and the District under the reasoning of this court in *Republic Steel Corp. v. United Mine Workers*, 570 F.2d 467 (3d Cir. 1978).

Accordingly, the judgment of the district court will be reversed.

